1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

7
8
9 GARY CHARLES BOWLIN, II,                    CV F   06-1361 LJO DLB HC

10                          Petitioner,        FINDINGS AND RECOMMENDATION
                                              REGARDING PETITION FOR WRIT OF
11          v.                                HABEAS CORPUS

12                                            [Doc. 7]
     C. CHRONES, WARDEN,
13
                             Respondent.
14 _____/

15

        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus
16
   pursuant to 28 U.S.C. § 2254.
17
                                      BACKGROUND
18
        On May 7, 2003, following jury trial in the Stanislaus County Superior Court, Petitioner
19
   was convicted of attempted murder (Cal. Pen. Code §§ 664/187, count one),[1] shooting at an
20
   occupied dwelling (§ 246, count three), assault with a firearm (§ 245(a)(2), count four), and
21
   possession of a firearm by a felon (§ 12021(a), count five).[2]  It was further alleged that during the
22
   commission of count one, Petitioner intentionally and personally discharged an assault rifle
23
   within the meaning of section 12022.53(c); as to count one and counts three through five, it was
24
   also alleged that Petitioner personally used a firearm within the meaning of section 12022.5.
25

26
_____

27          [1] All further statutory references are to the California Penal Code unless otherwise indicated.

28          [2] After the People rested, the trial court granted Petitioner's section 118.1 motion as to count two
     (mayhem).  (RT 632.)

                                            1

1  Petitioner was sentenced to twenty-nine years and eight months in state prison.[3]  (CT 219-222,

2  238.)

3          Petitioner filed a timely notice of appeal to the California Court of Appeal, Fifth

4  Appellate District.  (Lodged Doc. No. 1.)  On April 16, 2004, the Court of Appeal affirmed the

5  judgment.  (Lodged Doc. No. 3.)  On May 3, 2004, the Court of Appeal modified the opinion in a

6  manner that did not affect the judgment.  (Lodged Doc. No. 4.)

7          Petitioner filed a petition for review in the California Supreme Court on May 18, 2004.

8  (Lodged Doc. No. 5.)  The petition was denied on June 23, 2004.  (Id.)

9          On or about November 5, 2004, Petitioner filed a petition for writ of habeas corpus in the

10  Stanislaus County Superior Court.  The petition was denied on November 15, 2004.  (Lodged

11  Doc. No. 6.)

12          On February 9, 2005, Petitioner filed a petition for writ of habeas corpus in the Fifth

13  District Court of Appeal.  The petition was denied on February 24, 2005.  (Lodged Doc. No. 7.)

14          On March 28, 2005, Petitioner filed a petition for writ of habeas corpus in the California

15  Supreme Court, which was denied on February 22, 2006.  (Lodged Doc. No. 8.)

16          Petitioner filed the instant federal petition for writ of habeas corpus on September 28,

17  2006, and a first amended petition on November 9, 2006.  (Court Docs. 1, 7.)

18          Respondent filed an answer to the amended petition on January 19, 2007.  (Court Doc.

19  13.)  Petitioner did not file a traverse.

20                                    STATEMENT OF FACTS

21          In October 2001, Watkins lived at 3204 Doris Court, in Modesto, California, at a home

22  that was owned by his ex-girlfriend, Polly Latino.  Watkins had lived at the home for

23  approximately 12 to 13 years.  (RT 65-67.)  Jack Blood was also living in the home with

24  Watkins.  (RT 68.)  Ms. Latino had moved out of the home after their breakup.  Watkins made

25  the mortgage payments until he encountered financial difficulties and had failed to pay the rent

26  for a couple months.

27  _____

28      [3]  More specifically, Petitioner received nine years on count one, seven years on count three - stayed, four
years on count four - stayed, eight months on county five, and twenty years for the enhancement on count one.

Sometime in June of 2001, Watkins telephoned Latino regarding the late mortgage payments. David Ramos answered the telephone and advised Watkins to pack up and leave the house. Watkins told Ramos it was none of his business. (RT 77-78.) Latino thereafter initiated eviction proceedings. (RT 69-70.) Sometime in July or August of 2001, Ramos and another unidentified person served Watkins with eviction papers. (RT 69-72, 95-96, 99, 148.) Thereafter, in September 2001, Watkins observed Ramos drive by the home and take a photograph of him cleaning up the front yard. Watkins followed the car and after it stopped, Ramos and Watkins "exchanged words,"during which time Ramos was "belligerent" and "angry." (RT 79-93.)

On October 1, 2001, Watkins had been out during the day and returned home at approximately 9:30 p.m. (RT 100-103.) As he was getting ready for bed the front doorbell rang. (RT 105.) At that time, the front door open, however, the steel-mesh security door covering it was closed. (RT 104-109.) Watkins went to the front door and immediately noticed Ramos who was "prancing" around. (RT 111-112.) Ramos appeared to be "agitated and very nervous." (RT 110-111.) Watkins asked Ramos what he was doing there, and he replied "Why don't you come on outside." (RT 111.) Ramos was holding an object which Watkins believed to be a billy club. (RT 112-115.) Watkins observed "a shadow" of another person moving about 15 feet away in his right field of peripheral vision. (RT 118-120, 146-147, 167, 170-171, 176, 352-353.) However, Watkins could not identify Petitioner as the second shooter at trial. (RT 144.) Watkins did not go outside and instead turned around to call 911, and as he did so he "felt a blast from a shotgun and [he] went down" just inside the doorway. (RT 121-122.)

Watkins was shot several times through the security door. (RT 123-124.) The first gunshot struck him on his left side torso. (RT 122, 125.) The second struck him on his left hip and arm. The third gunshot struck him in his left torso, and the fourth struck him in his left arm and torso. (RT 124.) Watkins also heard four or five additional gunshots that did not hit him. (RT 125.) Watkins believed that he heard between eight and ten gun shots. (RT 126, 152-153.)

Watkins called for his roommate Blood to help. (RT 128.) Blood called 911 at 10:17 p.m. (RT 128, 603.) Watkins did not recall if he talked to the 911 operator, but acknowledged

3

that it was his voice on the 911 tape recording. (RT 141-142.) An ambulance arrived a short time later and Watkins was taken to the hospital emergency room where he stayed for eight days. (RT 131, 142.) As a result of his injuries, Watkins had to undergo a couple of surgeries, and still had pellets lodged in his body. (RT 132-136, 139-141.) At trial, he testified that he still had physical limitations and was in pain. (RT 138.)

Police Officer, Jason Stewart, of the city of Modesto, responded to the home. (RT 180-181.) He followed the ambulance to the hospital, where he spoke with Watkins who told him that "Little Dave" (Ramos) had shot him at his front door. (RT 182.) He also stated that a second person was standing in the shadows near the street. (RT 183-184.) Officer, Michelle Wentink, also confirmed that Watkins indicated that "Little Dave" shot him. (RT 186-187.)

An identification technician from the Modesto Police Department, responded to the scene of the shooting on the night of October 1, 2001. (RT 358-359.) There, he recovered casings from a 7.62 by 39 caliber bullet (two of the casings were found in the gutter by the street in front right side of the house and the other two casings were found in the corner of the neighbor's yard) (RT 361-367) and "numerous" empty and expended 20-gauge shotgun shells in the front door (RT 368-370, 376-377). He observed that the inside of the hallway to the residence had been torn by the impact from the lead of the pellets. (RT 371.) He retrieved a shotgun wadding from the inside of the front door.[4] (RT 374.)

Monique Randal, who was employed at the AM/PM Arco in Ceres in October 2001, testified that she was responsible for changing the tapes for the surveillance cameras. (RT 211-212.)

Petitioner, his wife, and their son lived with Kimberly Barela on October 1, 2001. (RT 234-235.) She stated that Ramos and Petitioner hung out together around the time of October 1, 2001. (RT 237.) In fact, she had observed Ramos and Petitioner in the car together on prior occasions. (RT 239-240.)

---

[4] Brocchini testified that four bullet holes consistent with a high-powered rifle were discovered in the front wall of the house a short distance from the front door. (RT 385-286.) He also observed two bullet holes inside the house near the front door. (RT 387-388.)

On October 2, 2001, the day after the shooting, Ramos telephoned Kimberly Barela and asked her to "hide something for him" and she agreed to do so.  (RT 240-241.)  Petitioner and Ramos arrived at Barela's residence in Ramos' car a short time later.  Ramos then told Barela to remove a bag from the car's trunk and hide it.  (RT 241-242, 246, 257-258.)  She grabbed a blue pillowcase, that she recognized as hers, and although she noticed there was something in it she did not look inside.  Instead, she took it into her house and looked after her children until Ramos and Petitioner left.  (RT 246.)  A few minutes later, Petitioner telephoned Barela and asked whether she had hidden the pillowcase.  (RT 247, 257.)  She indicated that she had not, and Ramos told her to hide it in the water heater vent.  (RT 248-250.)  Barela did and did not look in the pillowcase.  (RT 252, 256.)  Ramos was the maintenance man at Barela's apartment complex, and he had been in her apartment on a few previous occasions.  (RT 248-249.)

Minutes later, Modesto Police Detective Allen Brocchini, knocked on Barela's apartment door.[5]  (RT 252.)  She initially lied about seeing or receiving any property from Petitioner and Ramos because she was nervous.  (RT 252.)  However, upon further questioning, she admitted she received some property from them and told Detective Brocchini it was hidden in the heater vent.  (RT 254-259.)  Detective Brocchini removed the pillowcase from the vent and found three boxes of Federal 20-gauge shotgun shells, four boxes of assault rifle rounds, nine-millimeter rounds, and five hundred .22 caliber rounds.  (RT 310-313.)

Tiffany Steenburg testified that she knew both Ramos and Petitioner, and had been close friends with Ramos for a couple of years.  (RT 315-316, 323-324, 418.)  On October 2, 2001, the day after the shooting, while Steenburg was at Charlene Waterfield's home, she received a phone call from a person she could not identify who said he needed to drop something off at her home.[6]  (RT 321-325, 404-407.)  Approximately twenty minutes later, Petitioner and Ramos arrived at

---

[5]  Brocchini testified that on October 2, 2001, he received a phone call from the manager of Valencia Plaza Apartments at 525 Lincoln.  Based on the information he received, he dispatched a "lookout" for Ramos' car.  (RT 305-307.)

[6]  Steenburgh denied telling Detective Brocchini that Ramos made the phone call to her on that day.  (RT 328.)  However, her testimony was impeached with her prior inconsistent statement through Detective Brocchini's testimony.  (RT 342.)  In addition, Waterfield testified that Petitioner called Steenburgh back after she paged him.  (RT 403-408, 417.)

Waterfield's home, and Steenburgh went outside to speak with them.  Steenburgh took an empty

diaper bag out of the house with her, and Ramos put another bag inside the diaper bag.[7]

Steenburgh took the diaper bag into Waterfield's home and looked inside of it, and although she

acknowledged that there was "something" inside the bag, but could not elaborate further.  (RT

332-333.)  However, Waterfield testified that Steenburgh opened the bag and showed her the

contents, which contained two gun magazines.  (RT 413-414.)  Steenburgh subsequently took the

bag home, and at one point noticed a black metallic shape inside.  (RT 332.)  She ultimately

placed the bag inside of a dresser drawer.  (RT 334.)

A couple days later, on October 4, 2001, Detective Brocchini went to Steenburgh's home

and asked her to give him what she had received.  Steenburgh initially told Brocchini that she did

not know what he was talking about; however, Brocchini said, "I already know what you have,

David already told me."  (RT 334-344.)  In response, Steenburgh then went to the bedroom to get

the bag from the dresser and gave it to Brocchini.  (RT 335-336.)  Brocchini found a fully loaded

(25 rounds of 7.62 x 39 millimeter rounds) magazine for an SKS assault rifle, a loaded magazine

(40) rounds for a .22 caliber rifle, and a loaded nine-millimeter hand gun.  (RT 342-349.)

In an unrelated matter, on September 24, 2001, Officer Jeff Eastwood, of the Modesto

city police, went to a house on Yosemite and found three expended shotgun shells, which were

presented as People's Exhibit 38, at trial.  (RT 419-422.)

Ronald Welsh, a criminalist for the California Department of Justice, examined the

shotgun shells found by Eastwood.  (RT 424-425, 431, 433-434.)  He compared the shells found

by Eastwood to the shells found at the scene of the shooting of Watkins and determined they

were fired by the same weapon.  (RT 434-437.)

Two of the shells found by Eastwood appeared to have blood on them.  (RT 452-453.)

Walsh used a swab to collect a sample of the blood.  Walsh collected a sample and sent it to the

Department of Justice laboratory in Richmond.  (RT 454-458.)

Colleen Spurgeon, a criminalist at the Department of Justice's Richmond laboratory,

---

[7] Although Steenburgh denied telling Detective Brocchini that Ramos put the other bag inside the diaper
bag, she was subsequently impeached by her prior inconsistent statement through Brocchini's testimony. (RT 342.)

1   examined the sample sent by Walsh and compared it to Petitioner's DNA sample taken from his

2   blood and determined that the blood matched the blood found on the shotgun shells found by

3   Walsh.  (RT 465-467, 484-487, 494-500.)

4          Joanna Torres testified that in October of 2001, she had known Ramos for approximately

5   three weeks to a month.  Although they were "interested" in each other, the relationship had not

6   yet become romantic.  (RT 557-558.)  On October 1, 2001, she was working at the AM/PM Mini

7   Market in Ceres.  (RT 559.)  Ramos and another individual whom she could not recall, picked

8   her up at that location.  (RT 558-562, 575-577.)  The other individual was driving Ramos' car.

9   (RT 562, 573-574.)  Torres denied telling detectives that the person with Ramos was Petitioner.

10  (RT 566, 569, 573-574, 584.)  An AM/PM store videotape revealed that Torres left the store at

11  10:33 p.m. after getting into the backseat of Ramos' car.  (RT 211-221, 575.)  All three of them

12  went back to her apartment where they spent the night.  (RT 577-578.)

13         At trial, Torres acknowledged that she had identified Petitioner as "G" in a photographic

14  lineup on October 5, 2001.  She indicted that she met him only once through their mutual friend,

15  Steenburgh.  (RT 560, 568, 574, 579.)

16         Torres was impeached by the testimony of Detective Brocchini, who interviewed her after

17  the shooting.  (RT 586, 607.)  Brocchini testified that Torres unequivocally identified Petitioner

18  "within seconds" as "G" in a photographic lineup.  (RT 589-590.)  She told him she met him

19  through Steenburgh and Ramos and had seen him on several occasions prior to the shooting.

20  (RT 591.)  Torres told Brocchini that Steenburgh and "G" had recently been in a car accident

21  while both were in the same car.  (RT 602.)  Brocchini determined that the AM/PM Market was

22  approximately a ten minute drive from the scene of the Watkin's shooting.  (RT 604-606.)

23                                         DISCUSSION

24  A.     Jurisdiction

25         Relief by way of a petition for writ of habeas corpus extends to a person in custody

26  pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

27  or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

28  529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of the Stanislaus County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.      Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The AEDPA altered the standard of review that a federal habeas court must apply with respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v. Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000).  "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  Lockyer, at 1175 (citations omitted).  "Rather, that application must be objectively unreasonable."  Id. (citations omitted).

1   While habeas corpus relief is an important instrument to assure that individuals are

2   constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392

3   (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a

4   criminal conviction is the primary method for a petitioner to challenge that conviction.  Brecht v.

5   Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's

6   factual determinations must be presumed correct, and the federal court must accept all factual

7   findings made by the state court unless the petitioner can rebut "the presumption of correctness

8   by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115

9   S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day,

10  110 F.3d 1380, 1388 (9th Cir. 1997).

11  C.      Insufficient Evidence to Support Convictions

12          Petitioner contends that there was insufficient evidence to prove that he was present

13  during the crime or that he personally discharged a firearm.

14          Petitioner presented this claim on direct appeal to the California Court of Appeal and

15  California Supreme Court. (Lodged Doc. Nos. 1, 3, 5.)  Because the California Supreme Court's

16  opinion is summary in nature, however, this Court "looks through" that decision and presumes it

17  adopted the reasoning of the California Court of Appeal, the last state court to have issued a

18  reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115

19  L.Ed.2d 706 (1991) (establishing, on habeas review, "look through" presumption that higher

20  court agrees with lower court's reasoning where former affirms latter without discussion); see

21  also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000) (holding federal courts look to

22  last reasoned state court opinion in determining whether state court's rejection of petitioner's

23  claims was contrary to or an unreasonable application of federal law under § 2254(d)(1)).

24          The law on insufficiency of the evidence claim is clearly established.  The United States

25  Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a

26  federal court must determine whether, viewing the evidence and the inferences to be drawn from

27  it in the light most favorable to the prosecution, any rational trier of fact could find the essential

28  elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).

1   Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

2          There was sufficient, albeit circumstantial evidence, to support the jury's finding that

3   Petitioner was present and participated in the shooting.[8]  Mr. Watkins stated unequivocally that

4   defendant Ramos confronted him at the front door and he observed another individual's shadow

5   standing near the road.  (See RT 109-120, 141, 146-147, 167, 170-171, 182-184.)  In addition,

6   several other witnesses testified that Petitioner was with Ramos on the day of the shooting.  (RT

7   237, 325, 407-409.)   Then after the shooting occurred, Petitioner asked his housemate to hide

8   evidence from the shooting.  (RT 240-242, 246, 248-250, 256-257.)  Based on this evidence, a

9   rationale trier of fact could reasonably determine that the person standing fifteen feet away from

10  the victim was Petitioner.

11         It was also reasonable and rationale for the jury to find that Petitioner was armed with a

12  firearm at the scene of the shooting.  Such finding is supported by the evidence that two persons

13  were armed at the scene, and Ramos clearly had the shotgun as the victim was shot at close range

14  by several shotgun blasts.  (RT 112-115, 121-125.)  In addition to the five expended shotgun

15  shells, several casings for an automatic weapon were found at the scene.  (RT 366-368.)

16  Furthermore, both Petitioner and Ramos asked friends to hide evidence from the shooting,

17  including ammunition of the same type used and found at the scene of the shooting. (RT 240,

18  247, 257, 310-313, 342-349.)  Additionally, Petitioner and Ramos were together in Ramos' car at

19  the AM/PM store, a ten minute drive from the scene of the shooting, within fifteen minutes of the

20  shooting.

21         Based on the foregoing, after viewing the evidence in the light most favorable to the state

22

23

24  [8]  As the trial court properly instructed the jury, CALJIC 2.00 which defined circumstantial evidence as
    follows:

25              [E]vidence that, if found to be true, proves a fact from which an inference of the existence
            of another fact may be drawn.

26              An inference is a deduction of fact that may logically and reasonably be drawn from
            another fact or group of facts established by the evidence.

27              It is not necessary that facts be proved by direct evidence.  They may be proved also by
            circumstantial evidence or by a combination of direct evidence and circumstantial evidence.  Both
            are acceptable means of proof.  Neither is entitled to any greater weight than the other.

28  (CT 175-176.)

court judgment and after considering all reasonable inferences in support of that judgment, a rational trier of fact could have found Petitioner guilty beyond a reasonable doubt.  Accordingly, the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

D.    Trial Court Err During Sentencing[9]

Petitioner contends the trial court erred by failing to "stipulate whether" his sentence for a violation of section 12022.53(c) was concurrent or consecutive under section 669.[10]

Petitioner presented this claim to the California Supreme Court by way of petition for writ of habeas corpus, which was summarily denied, without comment. **(**Lodged Doc. No. 8.**)** AEDPA's strict standard of review is relaxed when the state court reaches a decision on the merits but provides no reasoning to support its conclusion. Under such circumstances, the federal court must "independently review the record to determine whether the state court clearly erred in its application of Supreme Court law." Brazzel v. Washington, 491 F.3d 976, 981 (9th Cir.2007), *quoting* Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir.2002); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir.2000) ("Federal habeas review is not de novo when the state court does not supply

---

[9]  The Court addresses the claims out of the order as raised in the petition for ease of analysis and judicial efficiency.

[10]  Section 669 states the following:

When any person is convicted of two or more crimes, whether in the same proceeding or court or in different proceedings or courts, and whether by judgment rendered by the same judge or by different judges, the second or other subsequent judgment upon which sentence is ordered to be executed shall direct whether the terms of imprisonment or any of them to which he or she is sentenced shall run concurrently or consecutively.

. . .

In the event that the court at the time of pronouncing the second or other judgment upon that person had no knowledge of a prior existing judgment or judgments, or having knowledge, fails to determine how the terms of imprisonment shall run in relation to each other, then, upon that failure to determine, or upon that prior judgment or judgments being brought to the attention of the court at any time prior to the expiration of 60 days from and after the actual commencement of imprisonment upon the second or other subsequent judgments, the court shall, in the absence of the defendant and within 60 days of the notice, determine how the term of imprisonment upon the second or other subsequent judgment shall run with reference to the prior incomplete term of imprisonment.  Upon the failure of the court to determine how the terms of imprisonment on the second or subsequent judgment shall run, the term of imprisonment on the second or subsequent judgment shall run concurrently.

The Department of Corrections shall advise the court pronouncing the second or other subsequent judgment of the existence of all prior judgments against the defendant, the terms of imprisonment upon which have not been completely served.

1   reasoning for its decision, but an independent review of the record is required to determine

2   whether the state court clearly erred in its application of controlling federal law.").

3          First, this claims does not raise a federal constitutional violation and is not cognizable via

4   section 2254.  State law rules in the application of state sentencing law does not raise a federal

5   constitutional issue.  Johnson v. Arizona, 462 F.2d 1352, 135301354 (9th Cir. 1972). Specifically,

6   an alleged error in consecutive sentences is not a federal question.  Beaty v. Stewart, 303 F.3d

7   975, 986 (9th Cir. 2002); Cacoperdo v. Demosthenes, 37 F.3d 504, 507-508 (9th Cir. 1994).  The

8   misinterpretation of state law results in a due process violation only if the sentence is arbitrary

9   and capricious.  Richmond v. Lewis, 506 U.S. 40, 50 (1992).  Indeed, relief is only available if it

10  is determined that the sentence is arbitrary or fundamentally unfair.  Newton v. Superior Court,

11  803 F.2d 1051, 1055 (9th Cir. 1986).  In this instance, even if Petitioner's claim can be

12  characterized as raising a federal constitutional violation, it nonetheless fails on the merits.

13         There was no violation of section 669.  Specifically, the transcript of the sentence, reflects

14  that the trial court imposed the aggravated term of nine years on count one (§§ 664/187), then

15  enhanced the sentence on that count pursuant to section 12022.53 which adds an additional and

16  consecutive twenty years.[11]  (RT 776.)  The court imposed the aggravated term of seven years on

17  count three (§ 246), enhanced by ten years pursuant to 12022.5, yet it was stayed pursuant to

18  section 654.  (Id.)  As to count four (§ 245(a)(2)), the court imposed an aggravated four-year

19  term, enhanced by ten years pursuant to section 12022.5, then stayed its imposition pursuant to

20  section 654.  (Id.)  Last, with regard to the section 12021(a) offense (count five), the court

21  indicated that it "intended to do eight months consecutive on that as far as it's separate and not a

22  654." (Id.)  After defense counsel agreed such sentence was correct, the court imposed "the

23  middle-term of two years for the 12021(a), that's a totally separate offense, running that

24  consecutive, staying two-thirds, one-third be imposed, for a total of eight months to be served."

25  (RT 776-777.)  As reflected above, the court properly determined that the sentence of eight

26  months on count five for a violation of section 12021(a) was to be served "consecutive" to the

27

28         [11]  There was an additional enhancement of three years pursuant to section 12022.5, which was stayed
       pursuant to section 654.  (RT 776.)

twenty-nine years imposed on count one, for a total sentence of twenty-nine years and eight

months. All other terms and enhancements were stayed. (Id.) Based on the foregoing,

Petitioner's claim to the contrary is rejected.

E.    Imposition of Upper Term/Violation of Sixth Amendment Right to Jury Trial

Petitioner contends that the trial court violated his right to a jury trial under the Sixth

Amendment by imposing the upper term based on factors that were not found true beyond a

reasonable doubt by the jury.

Petitioner presented this claim to the Stanislaus County Superior Court in his petition for

writ of habeas corpus. The Superior Court dismissed the petition on November 15, 2004,

stating:

> The Court, having received the Defendant's Petition for a Writ of Habeas
> Corpus on November 8, 2004, hereby denies it. The Court also denies his request
> for appointment of counsel.
> These requests based on Blakely v. Washington (2004) 124 S.Ct. 2531 are
> premature. The law in California is still unsettled. Based on the fact that
> Defendant, even if successful in this matter, has many more years to serve.
> The Court notes that People v. Picado (11-5-04) 2004 DJDAR 12609
> holds that the trial court may impose an upper term without the jury finding
> aggravating factors. This 1st District Court of Appeal decision is contrary to two
> from the 4th District Court of Appeal. People v. Lemus (9-20-04) 2004 DJDAR
> 11763 and People v. George (9-15-04) 2004 DJDAR 11568. Even if none of
> these cases are considered by the California Supreme Court, the issue is presently
> before it in People v. Towne (S125677).
> Therefore, this Court will select the reasoning in Picado now, but will
> reconsider should the California Supreme Court rule otherwise.

(See Lodged Doc. No. 6, Order of Denial.) Petitioner then raised the claim in his habeas corpus

petition filed in the Fifth District Court of Appeal. The petition was denied without comment on

February 24, 2005. (Lodged Doc. No. 7.) The California Supreme Court subsequently denied

the claim, without comment or citation, on February 22, 2006. (Lodged Doc. No. 8.) However,

in such instance, "where there has been on reasoned state judgment rejecting a federal claim,

later unexplained orders upholding that judgment or rejecting the same claim rest upon the same

ground." Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991); Lacy v. Lewis, 123 F.Supp.2d 533,

539-540 (C.D. Cal. 2000). As previously stated, the Superior Court denied the petition reasoning

that "a trial court may impose an upper term without the jury finding aggravating factors," but

noted that the law was unsettled and had not been addressed by the California Supreme Court.

(Lodged Doc. No. 6.)

At the beginning of the sentencing hearing, the court expressed its initial inclination regarding the appropriate punishment:

THE COURT: Just to give you a tentative where I am before I hear comments, as far as [Petitioner], the maximum punishment as to Count I is five, seven and nine.  The Court would impose the aggravated term of nine years because of the seriousness of the offense and likely that a jury would have found it was premeditated and deliberated based on what happened to the codefendant.  And from my own personal view of the evidence.  Also added to that would be twenty years for the 12022.53, and everything else would be stayed pursuant to 654.

(4 RT 767-768.)

After listening to argument by counsel, the Court imposed the aggravated term stating:

> THE COURT: . . . As far as [Petitioner], you were very fortunate there was a slip-up, actually fortunately you weren't the one that caused the actual injury, although you certainly tried, but just by quirk it becomes a second degree attempted murder for Count I, Court is imposing the aggravated term of nine years, and *clearly it's a violent act*.  It should be punishable by life similar to the codefendant.  However, it is not.
> Clearly, the crime involved *planning and sophistication and furthermore*, [Petitioner] *was on probation* at the time, so the Court is imposing the aggravated term of nine years as to Count I.

(RT 776, emphasis added.)

The trial court cited and relied on the probation report filed April 30, 2003, which stated:

> CIRCUMSTANCES IN AGGRAVATION
> Rule 4.42(b)(1)[12]: The defendant engaged in violent conduct, which indicates a serious danger to society.
> Rule 4.421(a)(8): The manner in which the crime was carried out indicates planning, sophistication, or professionalism.
> Rule 4.421(b)(4): The defendant was on probation when the crime was committed.
> CIRCUMSTANCES IN MITIGATION
> None.

(CT 230-231.)

In Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000), the Supreme Court overturned a sentencing scheme that allowed a state judge to enhance a defendant's penalty

---

[12] Rule references are to the California Rules of Court.

beyond the prescribed statutory maximum upon finding, by a preponderance of the evidence, that

the defendant "acted with a purpose to intimidate an individual or group of individuals because

of race, color, gender, handicap, religion, sexual orientation, or ethnicity." Apprendi v. New

Jersey, 530 U.S. at 469.  The Supreme Court reversed, holding that "any fact that increases the

penalty for a crime *beyond the prescribed statutory maximum* must be submitted to jury, and

proved beyond a reasonable doubt." Id. at 490. (Emphasis added.)

In Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531 (2004), the Court explained that

the "statutory maximum" for *Apprendi* purposes is the "maximum" sentence a judge may impose

solely on the basis of facts reflected in the jury verdict or admitted by the defendant.  In other

words, the relevant "statutory maximum " is not the maximum sentence a judge may impose

after finding additional facts, but the maximum he may impose without any additional facts." Id.

at 303-304.

In both Apprendi and Blakely, state law established an ordinary sentencing range for the

crime the defendant was convicted of committing, but allowed the court to impose a sentence in

excess of that range if it determined the existence of specified facts not intrinsic to the crime.  In

each case the Supreme Court held that a sentence in excess of the ordinary range was

unconstitutional because it was based on facts that were not admitted by defendant or found true

by the jury beyond a reasonable doubt.

In United States v. Booker, 543 U.S. 220, 125 S. Ct. 788 (2005), the Court applied its

holding in Blakely to the Federal Sentencing Guidelines, finding the Guidelines unconstitutional.

In reforming the Guidelines, the Court stated "If the Guidelines as currently written could be read

as merely advisory provisions that recommended, rather than required, the selection of particular

sentences in response to differing sets of facts, their use would not implicate the Sixth

Amendment.  We have never doubted the authority of a judge to exercise broad discretion in

imposing a sentence within a statutory range." Id. at 233.  "For when a trial judge exercises his

discretion to select a specific sentence within a defined range, the defendant has no right to a jury

determination of the facts that the judge deems relevant." Id.

In People v. Black, 35 Cal. 4th 1238 (June 20, 2005), the California Supreme Court held

15

1 that California's Determinative Sentencing Law satisfied federal constitutional law as follows:

2 "*Blakely* and *Booker* established a constitutionally significant distinction between a sentencing

3 scheme that permits judges to engage in the type of judicial fact finding typically and

4 traditionally involved in the exercise of judicial discretion employed in selecting a sentence from

5 within the range prescribed for an offense, and a sentencing scheme that assigns to judges the

6 type of fact-finding role traditionally exercised by juries in determining the existence or

7 nonexistence of elements of an offense." People v. Black, 35 Cal.4th at 1253. "[I]n operation

8 and effect, the provisions of the California determinate sentence law simply authorize a

9 sentencing court to engage in the type of fact-finding that traditionally has been incident to the

10 judge's selection of an appropriate sentence within a statutorily prescribed sentencing range." Id.

11 at 1254. The Court held that the "presumptive" midterm does nothing more than establish a

12 "reasonableness" constraint on an otherwise wholly discretionary sentencing choice akin to that

13 which the United States Supreme Court has deemed constitutional. Id. at 1261.

14        In Cunningham v. California, 549 U.S. 270, 127 S.Ct. 856 (2007), the Supreme Court

15 overruled the holding in Black, and held that the middle term in California's determinate

16 sentencing law was the relevant statutory maximum for the purpose of applying Blakely and

17 Apprendi. Id. at 868. Specifically, the Court held that imposing the upper sentence violated the

18 defendant's Sixth and Fourteenth Amendment right to a jury trial because it "assigns to the trial

19 judge, not the jury, authority to find facts that expose a defendant to an elevated 'upper term'

20 sentence." Id. at 860.

21        Most recently, in Butler v. Curry, 528 F.3d 624 (June 9, 2008), the Ninth Circuit found

22 that the Supreme Court's decision in Cunningham did not announce a new rule of constitutional

23 law under Teague's nonretroactivity rule.[13]   Id. at 633-639.   Rather, Cunningham "simply

24 applied the rule of *Blakely [v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed. 2d 403

25 (2004)], to a distinct but closely analogous sentencing scheme.   That the Supreme Court held for

26

27      [13] In Teague v. Lane, 489 U.S. 288 (1989), the Supreme Court held that a new rule of constitutional law
cannot be applied retroactively on federal collateral review to upset a state conviction or sentence unless the new rule

28 forbids criminal punishment of primary, individual conduct or is a "watershed" rule of criminal procedure.   Caspari
v. Bohlen, 510 U.S. 383, 396 (1994).

1   the first time that *California's* sentencing scheme violates the Sixth Amendment does not render

2   its decision in <u>Cunningham</u> a new rule."  <u>Id</u>. at 636.

3          Respondent filed its answer to the petition prior to the Supreme Court's decision in

4   <u>Cunningham</u>, and obviously prior to the Ninth Circuit's recent decision in <u>Butler</u>.  However, for

5   the reasons explained below, further briefing is not necessary.  Petitioner's conviction became

6   final on September 22, 2004, when the time for filing a petition for writ of certiorari expired (i.e.,

7   ninety days after the California Supreme Court denied the petition for review.  (Lodged Doc. No.

8   5).  See Cal. S.Ct. R. 13.

9          In order to determine whether existing precedent dictated that California's DSL was

10   inconsistent with the Sixth Amendment right to a jury trial, the Court must "'ascertain the legal

11   landscape as it . . . existed'" before September 22, 2004, the date Petitioner's conviction became

12   final.  <u>Butler</u>, 528 F.3d at 634.  <u>Blakely</u> was decided on June 24, 2004, and contrary to

13   Respondent's argument, under this Court's current Circuit authority, California's Determinate

14   Sentencing Law ("DSL") clearly violated the principle established in <u>Apprendi</u> and <u>Blakely</u>, that

15   any fact, other than a prior conviction, that increases the penalty for the crime beyond the

16   statutory maximum must be submitted to the jury, and proved beyond a reasonable doubt.  In

17   <u>Butler</u>, the Ninth Circuit found that California's sentencing law was virtually identical to

18   Washington's sentencing law struck down in <u>Blakely</u>.  <u>Butler</u>, 528 F.3d at 635-636.  Like the

19   Washington sentencing statute at issue in <u>Blakely</u>, California's DSL, required imposition of the

20   middle term unless the *judge* found factors in aggravation or mitigation, provided a

21   nonexhaustive list of possible reasons for an exception sentence and an exceptional sentence

22   could be based on factors other than those found by a jury beyond a reasonable doubt.  <u>Id</u>. at 635-

23   636.  In sum, California's DSL, like the Washington sentencing law at issue in <u>Blakely</u>, violated

24   the Sixth Amendment because the maximum penalty for the crime could be based on facts found

25   only by a judge and not a jury.  Therefore, <u>Cunningham</u> did nothing more than reiterate and apply

26   the holding from <u>Blakely</u> to California's DSL. <u>Id</u>. at 636.

27          Based on the foregoing, the last reasoned state court opinion of the Stanislaus County

28

1  Superior is contrary to clearly established federal law in Apprendi and Blakely.[14]  However, such

2  finding does not automatically entitle Petitioner to relief.  Instead, the "power to grant the writ of

3  habeas corpus to a state inmate depends on his actually being 'in custody in violation of the

4  Constitution or laws . . . of the United States.'"  Butler, at 641 (citing 28 U.S.C. § 2241(c)(3).)

5  To this end, the Court must apply a de novo standard of review to determine whether a

6  constitutional violation has occurred.  Butler, at 641.

7       Butler dispelled any argument that a defendant's probationary status at the time of the

8  current offense falls within the "prior conviction" exception as established in Almendarez-Torres

9  v. United States, 523 U.S. 224, 244, 247 (1998).  Butler, 528 F.3d at 641-644.  The Ninth

10 Circuit's finding was based on the narrow scope of the prior conviction and the exception was

11 limited to factual findings that are readily apparent from the face of the conviction documents

12 themselves.  Id. at 644.  As applied to the probationary status, the Ninth Circuit reasoned that

13 although the fact that the defendant was initially sentenced to probation may be reflected on the

14 conviction document itself, the fact that a defendant was on probation at the time of the current

15 offense, will not be reflected in the documents of the prior conviction, nor could it be

16 conclusively inferred from such document.  Butler, 528 F.3d at 645-646.  Therefore, because the

17 fact that Petitioner was on probation at the time of the current offense does not fall within the

18 narrow prior conviction exception, the judge is not authorized to make such finding for

19 imposition of the upper aggravated term.

20      As a consequence, it must be determined whether the error in sentencing Petitioner to the

21 aggravated term based on his probationary status was harmless.  See Washington v. Recuenco,

22 548 U.S. 212 (2006) (sentencing errors are subject to harmless error analysis).  In Brecht v.

23 Abrahamson, 507 U.S. 619, 113 S.Ct. 1710 (1993), the U.S. Supreme Court substantially

24 restricted state prisoners' access to federal habeas relief by requiring a showing that the violation

25

26 _____

27 [14] The Court notes that, unlike in Butler, at the time Petitioner's conviction became final, Booker had not yet been decided.  However, the decision in Booker does not appear to be dispositive to the Court's holding in Butler,

28 based on the conclusion of the Court's heavy reliance and analogy of California DSL to Washington's sentencing law at issue in Blakely.  See Butler, 528 F.3d 636-636.  In addition, the Supreme Court's decision in Booker, applied the holding announced in Blakely to the Federal Sentencing Guidelines.  Booker, 543 U.S. at 223.

of a federally guaranteed right had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623, 113 S.Ct. 1710, 1714 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253 (1946)).  In order for an error to have a "substantial and injurious effect or influence," it must have "affected the verdict." O'Neal v. McAnnich, 513 U.S. 432, 115 S.Ct. 992 (1995).  More specifically, "[u]nder that standard, we must grant relief if we are in 'grave doubt' as to whether a jury would have found the relevant aggravating factors beyond a reasonable doubt." Butler, 528 F.3d at 648 (citing O'Neal v. McAninch, 513 U.S. 432, 436 (1995).).  "Grave doubt exists when, 'in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.'" Butler, 528 F.3d at 648 (citing O'Neal, at 435.).

"[T]he relevant question is not what the trial court would have done, but what it legally could have done." Butler, 528 F.3d at 648-649 (emphasis in original).  It is clear that under California law only one aggravating factor need to be proven for imposition of the upper aggravated term where the aggravating factor outweighs the cumulative effect of all mitigating factors. People v. Nevill, 167 Cal.App.3d 198, 202 (1985); see also People v. Black, 41 Cal.4th 799, 806 (2007), Butler, 528 F.3d at 642-643.

As previously stated, in imposing the upper term, the court cited three factors in aggravation: 1) Petitioner engaged in violent conduct, which indicates a serious danger to society; 2) the manner in which the crime was carried out indicates planning, sophistication, or professionalism; and 3) the defendant was on probation when the crime was committed.  (RT 776.)

Here, as to the third factor, unlike in Butler, the record in this Court contains a copy of the probation report which was submitted to and relied on by the trial court in imposing Petitioner's sentence. (CT 226-232; see Butler, 528 F.3d at 651-652 (case remanded to district court because the court did not find a probation report or any other document that reflected Butler's probationary status at the time of the crime.)).  It was noted in the probation report, and adopted by the trial court at sentencing, that Petitioner was on probation when the crime was committed.  (CT 230.)  The current commitment offense occurred on October 1, 2001.  The criminal history

section of the probation report indicates that, in addition to others, on January 27, 1999, in the

Stanislaus County Superior Court, Petitioner was convicted of a violation of California Vehicle

Code section 10851 (case # 194914) and California Health and Safety Code section 11350 (case

# 197696), both felonies.  (CT 228.)  Petitioner was sentenced to three years probation and 270

days in jail, as to both conviction.  (Id.)  Accordingly, any error in sentencing Petitioner to the

upper aggravated term based on his probationary status was harmless because had such

information been submitted to the jury, there is no doubt the jury would have found Petitioner's

probationary status proven beyond a reasonable doubt.

Accordingly, because it is clear, beyond a reasonable doubt, that there is at least one

aggravating factor in support of Petitioner's upper term sentence, any error was harmless.  For

this reason, the Court need not and does not elaborate on whether the first two findings are

likewise supported by proof beyond a reasonable doubt.

F.      Ineffective Assistance of Counsel for Failing to Object to Pronouncement of Sentence

Petitioner contends that trial counsel was ineffective for failing to object at the sentencing

hearing and argues the outcome would have been different.

Petitioner presented this claim to the California Supreme Court by way of petition for

writ of habeas corpus, which was summarily denied, without comment.  **(**Lodged Doc. No. 8.**)**

Accordingly, this court must "independently review the record to determine whether the state

court clearly erred in its application of Supreme Court law." Brazzel v. Washington, 491 F.3d

976, 981 (9th Cir.2007), *quoting* Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir.2002); Delgado

v. Lewis, 223 F.3d 976, 982 (9th  Cir.2000).

The law governing ineffective assistance of counsel claims is clearly established for the

purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe,

151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective

assistance of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S.

668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First,

the petitioner must show that counsel's performance was deficient, requiring a showing that

counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by

1  the Sixth Amendment. Strickland, 466 U.S. at 687.  The petitioner must show that counsel's

2  representation fell below an objective standard of reasonableness, and must identify counsel's

3  alleged acts or omissions that were not the result of reasonable professional judgment

4  considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348

5  (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges

6  a strong presumption that counsel's conduct falls within the wide range of reasonable

7  professional assistance.  Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v.

8  Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

9       Second, the petitioner must show that counsel's errors were so egregious as to deprive

10  defendant of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  The court must

11  also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's

12  ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356,

13  1461 (9th Cir. 1994).  More precisely, petitioner must show that (1) his attorney's performance

14  was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that

15  (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would

16  have been different.

17       A court need not determine whether counsel's performance was deficient before

18  examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

19  Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove

20  prejudice, any deficiency that does not result in prejudice must necessarily fail.

21       Ineffective assistance of counsel claims are analyzed under the "unreasonable

22  application" prong of Williams v. Taylor, 529 U.S. 362 (2000).  Weighall v. Middle, 215 F.3d

23  1058, 1062 (2000).

24       First, and fatal to Petitioner's claim, Petitioner fails to explain the basis upon which

25  counsel should have objected to the pronouncement of sentence, or how the outcome would have

26  been different.  As such, Petitioner's claim is nothing more than a conclusory allegation

27  unsupported by factual circumstances in the record.  Conclusory allegations do not warrant

28  habeas relief. See Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir.1995) (holding that conclusory

allegations made with no reference to the record or any document do not merit habeas relief).

To the extent Petitioner contends that defense counsel should have objected to the court's alleged failure "to specify at the time of judgment whether petitioner subsequent judgment, exfelon in possession of firearm [] would be concurrent or consecutive to the principle judgment of attempted murder. . . .", he is mistaken.  For the reasons explained under section D, ante, there was no sentencing err under California law.  In addition, to the extent Petitioner contends that counsel was ineffective for failing to object to the imposition of the upper term based on holding in Blakely (which was pending at the time of sentencing), it is likewise without merit. Counsel could not have been incompetent because counsel was not required to object on that basis as the law was unsettled.  See e.g. Fields v. United States, 201 F.3d 1025 (8th Cir. 2000).  Moreover, even if counsel was ineffective for failing to object on that basis, Petitioner suffered no prejudice as any error was harmless.  See sections D & F, ante.  Accordingly, Petitioner has not and cannot demonstrate that counsel was incompetent or that he was prejudiced thereby, and Petitioner's claim fails on the merits.

G.      Ineffective Assistance of Appellate Counsel

Petitioner further contends that appellate counsel was ineffective for "failing to set forth all arguable" claims during the sentencing phase.  (Petition, at 7.)

Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed according to Strickland 's two-pronged test.  See, e.g. Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.1989);  United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986).  A defendant must therefore show that counsel's advice fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, defendant would have prevailed on appeal.   Miller, 882 F.2d at 1434 & n. 9 (citing Strickland, 466 U.S. at 688, 694; Birtle, 792 F.2d at 849).  However, appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by defendant.  Jones v. Barnes, 463 U.S. 745, 751-54 (1983);  Miller, 882 F.2d at 1434 n.10. Nor does appellate counsel have a duty to raise nonmetirorious arguments.  See Strickland, 466

1   U.S. at 697; see also Boac v. Raines, 769 F.2d 1341, 1344 (9th Cir.1985); Shah v. United States,

2   878 F.2d 1156, 1162 (9th Cir.1989) (failure to raise a meritless legal argument does not

3   constitute ineffective assistance of counsel); Cooper v. Fitzharris, 551 F.2d 1162, 1166 (9th

4   Cir.1977).  The weeding out of weaker issues is widely recognized as one of the hallmarks of

5   effective appellate advocacy.  Id. at 1434 (footnote and citations omitted).  As a result, appellate

6   counsel will frequently remain above an objective standard of competence and have caused her

7   client no prejudice for the same reason--because she declined to raise a weak issue.  Id.

8        Petitioner presented this claim to the California Supreme Court in his petition for writ of

9   habeas corpus, which was summarily denied.  (Lodged Doc. No. 8.)

10        For the same reasons as discussed above under sections D and F, because there is no

11   merit to Petitioner's claim that the trial court erred in sentencing him under either the

12   Constitution or California law, appellate counsel could not and was not ineffective for failing to

13   raise such meritless claims.

14                           RECOMMENDATION

15        Based on the foregoing, it is HEREBY RECOMMENDED that:

16        1.        The instant petition for writ of habeas corpus be DENIED; and,

17        2.        The Clerk of Court be directed to enter judgment in favor of Respondent.

18        This Findings and Recommendation is submitted to the assigned United States District

19   Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of

20   the Local Rules of Practice for the United States District Court, Eastern District of California.

21   Within thirty (30) days after being served with a copy, any party may file written objections with

22   the court and serve a copy on all parties.  Such a document should be captioned "Objections to

23   Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served

24   ////

25   ////

26   ////

27   ////

28   ////

1   and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the

2   objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. §

3   636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time

4   may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th

5   Cir. 1991).

6         IT IS SO ORDERED.

7   **Dated:** __**August 12, 2008**__          _____**/s/ Dennis L. Beck**_____
                                                  UNITED STATES MAGISTRATE JUDGE